# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 26, 2012

Lyle W. Cayce
Clerk

No. 09-50323

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SAID FRANCISCO HERRERA, also known as Shorty; ARTURO ENRIQUEZ, also known as Tury; MANUEL CARDOZA, also known as Tolon; CARLOS PEREA, also known as Shotgun; EUGENE MONA, also known as Gino; BENJAMIN ALVAREZ, also known as T-Top,

Defendants - Appellants.

Appeals from the United States District Court
for the Western District of Texas
(08-CR-59)

Before DeMOSS, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:[*]

Said Francisco Herrera, Arturo Enriquez, Manuel Cardoza, Carlos Perea, Eugene Mona, and Benjamin Alvarez raise appeals relating to their respective convictions under one or more of the following statutes: §§ 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act (RICO) (prohibiting racketeering activity), § 1951(a) of the Hobbs Act (prohibiting extortion), 18

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-50323

U.S.C. §1956(h) (prohibiting money laundering), and 21 U.S.C. §§ 841(a) and 846 (prohibiting drug trafficking). Except for Mona's sentence, which we VACATE and REMAND for re-sentencing, the judgment of the district court is AFFIRMED.

I.

The six appellants were all associated, in varying degrees, with the Barrio Azteca (BA) criminal enterprise.[1] The BA is a prison gang that was founded in 1985 by inmates originally from El Paso, Texas, who were incarcerated in the Texas Department of Corrections (TDC) prison system. At the time of the appellants' trial in 2008, the BA's criminal operations and influence had grown to encompass various TDC and federal Bureau of Prisons (BOP) facilities, certain West Texas cities, and the city of Juarez, Mexico.

The BA's primary criminal activity involved the extortion of payments (known as "*cuotas*") from narcotics traffickers (known as "*tiendas*") who sold illegal drugs in BA territory. The BA ensured that the *tiendas* would pay the requisite *cuotas* through the threat and, if necessary, use, of violence, including murder. Once collected from the *tiendas*, *cuotas* would be converted into money orders so that they could be funneled into the prison commissary accounts of incarcerated BA leaders and senior members.

In addition to collecting *cuotas*, the BA also acted as a facilitator and enforcer of the illegal narcotics trade by: (1) serving as a source for *tiendas* to obtain additional supplies of narcotics; (2) collecting delinquent payments owed to *tiendas*; (3) restraining others from selling drugs in competition with the BA's *cuota*-paying *tiendas*; (4) engaging in sales of narcotics; (5) importing and transporting drugs for the *La Linea* drug cartel, which operates in Juarez,

---

[1] We review the evidence in the light most favorable to the verdict. *United States v. Salazar*, 542 F.3d 139, 143 (5th Cir. 2008).

No. 09-50323

Mexico; and (6) committing assaults and other violent crimes on behalf of the *La Linea* cartel.

The BA was organized in a hierarchical, paramilitary manner. The most senior BA position was captain ("*capo*"), then lieutenant, sergeant, soldier ("*soldado*"), and, finally, prospective member ("*esquina*"). The *capos*, most of whom were incarcerated, ran the organization by directing orders, often through direct communication or coded letters known as "*whilas*" or "*estucas,*" to lieutenants and sergeants, who would then carry out the *capos*' instructions or delegate the tasks to more junior members.

The appellants have all been convicted of illegal acts that occurred in association with the BA criminal enterprise between 2003 and 2008. Specifically, Manuel Cardoza, Benjamin Alvarez, and Carlos Perea, who were all *capos*, each received multiple life sentences for violating 18 U.S.C. §§ 1956(h), 1962(c), and 1962(d), and 21 U.S.C. §§ 841(a) and 846. Eugene Mona, who was a lieutenant, received a life sentence for violating 18 U.S.C. § 1962(d). Said Francisco Herrera, who was a sergeant, received multiple life sentences for violating 18 U.S.C. §§ 1951, 1962(c), and 1962(d), and 21 U.S.C. §§ 841(a) and 846. Arturo Enriquez, who was either a *soldado* or an *esquina*, received 180 months' imprisonment for violating 18 U.S.C. § 1951.

II.

Collectively, the appellants raise fifteen issues on appeal. Cardoza, Alvarez, Mona, Herrera, and Enriquez challenge the sufficiency of the evidence underlying their respective convictions. Cardoza, Mona, and Herrera contend that the district court sentenced them to life imprisonment in violation of the Supreme Court's decision in *Apprendi v. New Jersey*.[2] Cardoza and Alvarez argue that the district court's sentencing procedures ran afoul of the Supreme

---

[2] 530 U.S. 466 (2000).

No. 09-50323

Court's decision in *United States v. Booker*.[3]  Cardoza, Alvarez, and Perea challenge the district court's denial of their motion for a new trial based on the allegedly extreme jury protection measures imposed by the district court. Cardoza and Perea maintain that the district court erred in denying their motion for a new trial based on the government's alleged suppression of evidence in contravention of *Brady v. Maryland*.[4]  Alvarez argues that the district court's admission of Government's Exhibits 353 and 354 violated the Sixth Amendment's Confrontation Clause.  Perea contends that the district court erred in denying his motion for an evidentiary sentencing hearing.  Herrera and Enriquez appeal the district court's alleged reliance on improper information contained in the pre-sentence report.  Enriquez maintains that the district court erred in denying Enriquez's motion to suppress and motion for severance. Finally, Herrera claims that the district court erred in admitting various unspecified exhibits into evidence because such exhibits lacked the proper foundation.

### A.

Cardoza, Alvarez, Mona, Herrera, and Enriquez appeal the sufficiency of the evidence underlying their respective convictions.  Where, as in this case, the appellant moved for judgment of acquittal before the district court, we review the sufficiency of the evidence to support a conviction by considering whether any "rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United States v. Valdez*, 453 F.3d 252, 256 (5th Cir. 2006). This review is "highly deferential to the verdict." *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (quoting *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002)). "It is not necessary that the evidence

---

[3] 543 U.S. 220 (2005).

[4] 373 U.S. 83 (1963).

exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *Valdez*, 453 F.3d at 256 (quoting *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992)). We, therefore, do not consider whether the jury's verdict was correct, but instead focus upon the verdict's reasonableness. *Moreno-Gonzalez*, 662 F.3d at 372 (citing *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001)). Finally, in conducting this inquiry, we view the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, and resolve all conflicts in the evidence in favor of the verdict. *Id.*

1.

Cardoza and Alvarez challenge the sufficiency of the evidence underlying their convictions for violating 18 U.S.C. § 1956(h), which prohibits, among other things, participation in a conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956(a). In order to prove a conspiracy under § 1956(a), the government must show that the defendant knew of the money laundering scheme, voluntarily joined it, and possessed the requisite intent to commit the underlying § 1956(a) offense. *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996). Cardoza and Alvarez argue that the evidence was insufficient to show that they knew the money they admittedly received into their prison commissary accounts constituted the proceeds of unlawful activity. We disagree.

Through the testimony of multiple law enforcement and BA witnesses, the government established Cardoza's and Alvarez's positions as two of the leaders of a criminal enterprise designed to funnel extorted *cuotas* into the prison commissary accounts of high ranking BA members. This system involved two basic stages. First, the non-incarcerated BA members would extort weekly *cuotas* from narcotics traffickers operating in the BA's territory. Once collected, they would then transfer the *cuota* funds to the prison commissary accounts of

No. 09-50323

senior BA members, generally in the form of money orders. These money orders would typically be sent under fictitious names and addresses in order to conceal the senders' identities and the illicit source of the funds. The evidence sufficiently demonstrated that Cardoza and Alvarez knowingly and voluntarily participated in this *cuota*-funneling enterprise.

In Cardoza's case, the evidence showed that he directed the distribution of *cuota* funds into the commissary accounts of other BA members and also personally received *cuota* money into his own commissary account. Cardoza transmitted directions regarding *cuota* deposits through heavily-coded messages, which were introduced by the government at trial. The government also introduced conversations between Cardoza and Mona, who served as Cardoza's "bridge" to the outside world, wherein Cardoza ordered that a certain BA member should no longer receive a share of the *cuota* collections due to the member's upcoming release from prison. Furthermore, a former BA member, Gerardo Hernandez, testified that Cardoza ordered him, upon his release from prison in 2003, to investigate the cause of a decrease in *cuota* transfers to commissary accounts. Cardoza later wrote a letter ordering the BA to put David Merez "on ice" because Merez was responsible for this *cuota* shortfall.

Similarly, in Alvarez's case, Gustavo Gallardo—a former BA member who testified extensively about the structure of the BA and his involvement in collecting *cuotas*—stated that he previously sent *cuota* money to Alvarez's commissary account. Gallardo's transfer of the funds was not a random act of benevolence; Gallardo specifically sent the money to Alvarez because Alvarez was a BA *capo*.[5] Another BA member, Roberto Duran, testified that Alvarez once sent him a letter ordering that he send money to Alvarez, and that Duran

---

[5] Gallardo also testified that he and his fellow BA members were concerned when David Merez was failing to forward *cuotas* to the BA leadership in prison, demonstrating his understanding that portions of the *cuotas* were to be sent to *capos* like Alvarez.

6

No. 09-50323

eventually obtained the funds that he was ordered to send to Alvarez. Officer Sanchez similarly testified about a letter, which was admitted into evidence, that Alvarez sent to his "bridge" informing her how to properly send money orders to prisoners.

Given this evidence, we hold that a rational jury could have found beyond a reasonable doubt that Cardoza and Alvarez knowingly and voluntarily engaged in a conspiracy to funnel *cuota* payments, and also knowingly received *cuota* funds into their commissary accounts.

2.

Cardoza, Alvarez, and Herrera challenge the sufficiency of the evidence underlying their convictions of conspiracy to traffic in narcotics under 21 U.S.C. §§ 841(a) and 846.[6] To convict a defendant of conspiring to traffic in narcotics, the "government must prove: 1) the existence of an agreement between two or more persons to violate federal narcotics laws; 2) the defendant's knowledge of the agreement; and 3) the defendant's voluntary participation in the agreement." *United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996) (citing *United States v. Gallo*, 927 F.2d 815, 820 (5th Cir. 1991)). These elements "may be inferred from the development and collocation of circumstances." *Id.* (citations and internal quotation marks omitted). However, a defendant's "[m]ere presence at the scene of the crime or close association with co-conspirators will not alone support an inference of conspiracy but are factors that the jury may consider in finding conspiratorial activity." *Id.* (citing *Gallo*, 927 F.2d at 820).

---

[6] Section 841(a)(1) states that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Section 846 states that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

No. 09-50323

Cardoza and Alvarez argue that there was no evidence indicating that they were aware of or participated in the BA's drug trafficking activity. They contend that the drug trafficking activities of other BA members were unilateral endeavors by individual members, which lacked any connection to the BA criminal enterprise. Cardoza supports this contention by pointing out that he was incarcerated throughout the drug trafficking conspiracy. Cardoza and Alvarez also point out that the record is devoid of evidence directly connecting the incarcerated *capos* to the drug trafficking activities of free BA members.

We nevertheless hold that a rational jury could have reasonably inferred—based on the BA's structure and objectives, and the evidence linking the two appellants to the BA—that Cardoza and Alvarez were aware of and encouraged the BA's narcotics trafficking. For instance, the record indicates that the free BA members who collected and sent the *cuotas* were generally not permitted to keep any portion of the *cuota* collections for themselves. Instead, all of the *cuotas* were generally funneled to the incarcerated BA leadership. This raises the question of how the free rank-and-file BA members (as well as some free members of the BA leadership) earned any money. The evidence indicated that they did so, at least in part, through narcotics trafficking. Furthermore, there was evidence showing that, unlike *tiendas*, BA members who sold drugs were not required to pay any *cuotas* to the BA leadership. BA members could keep the proceeds of their drug sales for themselves. Given the existence of this *cuota* exemption, which incentivized free BA's to deal in narcotics, and the practical need for free BA members to earn money, it could be inferred that Cardoza and Alvarez had knowledge of, encouraged, and thus participated in, a narcotics trafficking conspiracy that was essential to the survival of the BA's overall *cuota* laundering scheme.

Moreover, the evidence indicated that BA members would supply *tiendas* with drugs if they lacked a sufficient supply. Thus, the BA would support the

8

No. 09-50323

businesses of drug dealers, who would then regularly pay *cuotas* to the BA, which would then be funneled to Cardoza, Alvarez, and other BA leaders.  Given this arrangement, the jury could have reasonably inferred that Cardoza and Alvarez, who benefitted from BA drug sales to *tiendas*, participated in a conspiracy to traffic narcotics.

With regard to Herrera, his brief indicates that he challenges the sufficiency of the evidence underlying all of his convictions; however, the brief fails to actually discuss Herrera's conviction pursuant §§ 841(a)(1) and 846.  We therefore hold that, to the extent Herrera intended to appeal this conviction, his claim is waived as inadequately briefed.  *See* Fed. R. App. P. 28(a)(9)(A); *United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001) ("Generally speaking, a defendant waives an issue if he fails to adequately brief it.").

Nonetheless, because it bears upon Herrera's substantive RICO conviction, discussed *infra*, we briefly note our conclusion that the evidence sufficiently supported Herrera's conviction under §§ 841(a)(1) and 846.  The jury heard testimony from at least two BA members who discussed Herrera's drug trafficking activities.  For instance, Jose Martin Garcia testified that Herrera owned his own *tienda*, known as Jaguars, where BA members would sell cocaine.[7]  BA member Josue Aguirre, who referred to Herrera as his "right hand man," similarly testified that he used to accompany Herrera while Herrera sold drugs at various bars, including Jaguars.  Thus, the evidence sufficently demonstrated that Herrera engaged in narcotics trafficking in association with the BA.

We hold that the evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Cardoza, Alvarez, and Herrera conspired to traffic in narcotics in violation of 21 U.S.C. §§ 841(a) and 846.

---

[7] Garcia also testified that he assisted Herrera in collecting *cuotas*.

No. 09-50323

3.

Herrera and Enriquez challenge the sufficiency of the evidence supporting their convictions of conspiracy to commit extortion under the Hobbs Act, 18 U.S.C. § 1951(a).[8] To prove a violation of the Hobbs Act, the government must prove beyond a reasonable doubt: (1) that a defendant induced, or attempted or conspired to induce, a person to part with property; (2) while acting knowingly and willfully by means of extortion; and (3) that the extortionate transaction delayed, interrupted, or adversely affected interstate commerce. *United States v. Mann*, 493 F.3d 484, 494 (5th Cir. 2007); *United States v. Snyder*, 930 F.2d 1090, 1093 (5th Cir. 1991). To establish a conspiracy under the Hobbs Act, the government must prove "an agreement between two or more persons to commit a crime, and an overt act by one of the conspirators to further the conspiracy." *United States v. Box*, 50 F.3d 345, 349 (5th Cir. 1995) (quoting *United States v. Stephens*, 964 F.2d 424, 427 (5th Cir. 1992)). However, "[p]roof of a conspiracy does not require direct evidence of an actual agreement between the co-conspirators, but may be inferred from circumstantial evidence." *United States v. Wright*, 797 F.2d 245, 253 (5th Cir. 1986) (citing *United States v. Reed*, 715 F.2d 870, 874 (5th Cir. 1983)).

The government presented evidence indicating that Herrera was a BA member who would assist the BA with opening *tiendas* and collecting *cuotas*. Herrera eventually obtained the rank of BA sergeant and was placed in charge of *cuota* collections for the east side of El Paso. The jury also heard evidence

---

[8] Section 1951(a) provides: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). Section 1951(b)(2) defines extortion as the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

that Herrera was involved in multiple assaults, including at least one assault on a drug dealer who had not been paying *cuotas*.

With regard to Enriquez, the evidence showed that he admitted to El Paso detectives that he collected *cuotas* for the BA. BA member Eric Saucedo also testified about an instance where Enriquez accompanied Saucedo and another BA member, Serio Munoz, on a visit to threaten a drug dealer named Jose Luis Oviedo for failing to pay *cuotas*. Enriquez acted as a "look-out" on this visit, which ended when Munoz shot and killed Oviedo. Detective Yvette Nevarez also testified that Enriquez, while being interviewed for a second time by police, stated that he went to Oviedo's home to collect *cuotas*.

Based on the foregoing evidence, the jury could have determined that Herrera and Enriquez were knowing and willful conspirators in an enterprise designed to extort *cuotas* from drug traffickers in contravention of the Hobbs Act. The only remaining question, therefore, is whether the BA's extortion of *cuotas* affected interstate commerce.

Our caselaw provides that illegal activity need only "slightly" affect interstate commerce to fall under the purview of the Hobbs Act, and that this inquiry is made on a "case-by-case basis." *Box*, 50 F.3d at 351. Similarly, in *Mann*, we stated that our prior decision in "*Box* demonstrates that a generalized connection between the alleged criminal activity and interstate commerce is sufficient to sustain a conviction of *conspiracy* to violate the Hobbs Act." *Mann*, 493 F.3d at 495. Furthermore, with regard to Hobbs Act cases involving drug trafficking, we have held that "interfering with or facilitating narcotics trafficking [is] sufficient to create an effect on interstate commerce, since drugs are traded on an interstate market." *United States v. Villafranca*, 260 F.3d 374, 378 (5th Cir. 2001) (citing *Box*, 50 F.3d at 353).

In this case, the evidence indicated that Herrera and Enriquez interfered with the drug trade by participating in the BA's conspiracy to extort *cuotas* from

drug traffickers through the threat and, if necessary, use, of violence. Given this activity—which also involved coordination between free BA members and prisoners incarcerated in different states, and between individuals on both sides of the United States–Mexico border—a rational jury could have found that the BA's extortion conspiracy affected interstate commerce.

We hold that the evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Herrera and Enriquez engaged in a conspiracy to commit extortion in violation of the Hobbs Act.

4.

Cardoza, Alvarez, and Herrera appeal the sufficiency of the evidence underlying their convictions for violating 18 U.S.C. § 1962(c), which prohibits engaging in the affairs of an enterprise through a "pattern of racketeering activity."[9] To establish a § 1962(c) violation, the "government must prove (1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was employed by or associated with the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through a pattern of racketeering activity." *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (citations and internal quotation marks omitted). Cardoza, Alvarez, and Herrera only dispute the last two elements of their respective § 1962(c) convictions, arguing that the evidence was insufficient to demonstrate that: (1) they "participated" in the BA; and (2) their alleged participation was through a "pattern of racketeering activity."

In order to satisfy § 1962(c)'s third element, the "defendant must have participated in the operation or management of the enterprise itself." *Id.* (citing

---

[9] Section 1962(c) states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or the collection of unlawful debt." 18 U.S.C. § 1962(c).

*Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)).  However, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."  *Id.* (quoting *Reves*, 507 U.S. at 184)).  We can easily conclude that the government presented ample evidence, some of which is discussed *supra*, that Cardoza and Alvarez, as BA *capos*, and Herrera, as a BA sergeant under the direction of the upper management (i.e., the *capos*), participated in the BA, thus satisfying § 1962(c)'s third element.

With regard to § 1962(c)'s fourth element, RICO defines a "pattern of racketeering activity" as requiring "at least two [predicate] acts of racketeering activity."  18 U.S.C. § 1961(5).  Section 1961(1) sets forth numerous criminal statutes that can constitute predicate acts of "racketeering activity," including 18 U.S.C. §§ 1951 and 1956.  It also provides that racketeering activity includes the "buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States."  18 U.S.C. § 1961(1)(D).  Thus, racketeering activity includes conduct proscribed by 21 U.S.C. §§ 841(a)(1) and 846.  This court has also explained that in order to "show the existence of a pattern of racketeering activity, the government must establish (1) that the racketeering acts are related and (2) that they amount to or pose a threat of continued criminal activity."  *Delgado*, 401 F.3d at 298 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

Section 1962(c)'s fourth element was sufficiently established in all three appellants' cases.  At trial, Cardoza and Alvarez were both convicted of conspiring to launder *cuotas* to prison commissary accounts in violation of 18 U.S.C. § 1956(h).  Cardoza, Alvarez, and Herrera were all convicted of conspiring with the BA to traffic narcotics in violation of §§ 841(a)(1) and 846.  And Herrera was convicted of conspiring to commit extortion in contravention of the Hobbs

No. 09-50323

Act, 18 U.S.C. § 1951. Thus, all three appellants committed two predicate racketeering acts. All of these predicate racketeering acts were also related as they were committed in furtherance of the BA's business. *See id.* (providing that RICO's "related acts" prong is satisfied when the acts were committed in furtherance of the criminal enterprise's business).

Furthermore, the government sufficiently demonstrated that the appellants' racketeering acts posed a threat of continued criminal activity. In *Delgado*, we held that a criminal enterprise's regular collection of "the dime" from drug dealers "evidenced a 'specific threat of repetition extending indefinitely into the future.'"[10] *Id.* (quoting *Nw. Bell*, 492 U.S. at 242). Similar to "the dime" in *Delgado*, the BA regularly collected *cuotas* from drug dealers operating in the BA's territory and, absent RICO prosecution, would likely have continued to do so into the future. Thus, based on *Delgado*, the continuity requirement is met in this case.

We hold that the evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Cardoza, Alvarez, and Herrera engaged in the affairs of an enterprise through a pattern of racketeering activity in violation of § 1962(c) of RICO.

5.

Cardoza, Alvarez, Herrera, and Mona appeal the sufficiency of the evidence underlying their convictions for violating 18 U.S.C. § 1962(d), which prohibits, among other things, conspiring to engage in the affairs of an enterprise through a pattern of racketeering activity.[11]

---

[10] As stated in *Delgado*, "[i]n exchange for membership, TMM members send 10% of their illegal proceeds ('the dime') to TMM headquarters. Members must also collect 'the dime' from non-member drug dealers and remit that money to TMM headquarters." *Delgado*, 401 F.3d at 293.

[11] Section 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)." 18 U.S.C. § 1962(d).

14

No. 09-50323

"To prove a RICO conspiracy, the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *Id.* at 296 (quoting *United States v. Posada-Rios*, 158 F.3d 832, 857–58 (5th Cir. 1998)). The government may establish these elements with circumstantial evidence. *Id.* Critically, unlike a § 1962(c) conviction, which requires a showing of two predicate acts constituting a "pattern of racketeering activity," a § 1962(d) conspirator "need not have committed or agreed to commit the two predicate acts." *Id.* (citing *Salinas v. United States*, 522 U.S. 52, 61–66 (1997)). Instead, the conspirator "need only have known of and agreed to the overall objective of the RICO offense." *Id.*

Based on our discussion in the preceding subsections, we hold that there was sufficient evidence for a rational jury to determine beyond a reasonable doubt that Cardoza, Alvarez, and Herrera knowingly agreed to engage in the BA's criminal enterprise in violation of § 1962(d) of RICO. Therefore, we must only discuss Mona's remaining claim.

Mona's challenge is unique because, unlike the other three appellants, he did not commit any predicate RICO offenses. Mona was only convicted of conspiring to engage in a pattern of racketeering activity. Nevertheless, *Delgado* makes clear that a co-conspirator need not commit a predicate RICO act to violate § 1962(d): he "need only have known of and agreed to the overall objective of the RICO offense." *Id.* We hold that the evidence sufficiently indicated that Mona knew of and agreed to further the overall objectives of the BA enterprise.

For instance, the evidence established that Mona was a BA lieutenant who served as the "bridge" (i.e. the communication link) between *capo* Cardoza and other BA members. Mona would communicate with Cardoza through heavily-coded letters, telephone calls, and prison visits, and then Mona would either forward the communications onward or personally direct Cardoza's orders to

15

other BA members.  Also, on behalf of *capo* David Merez, Mona delivered messages, provided transportation to other BA members, and served as a conduit for transferring *cuota* money.  This evidence sufficiently demonstrated that Mona knowingly and intentionally assisted in the perpetuation of the BA's extortion and money laundering scheme.  Accordingly, the evidence was sufficient to enable a rational jury to conclude beyond a reasonable doubt that Mona knew of and agreed to further the objectives of the BA.

B.

Cardoza, Mona, and Herrera challenge their sentences to life imprisonment under 18 U.S.C. § 1962(d) because the sentences allegedly exceeded the statutory maximum authorized by the jury's verdict in violation of the Supreme Court's decision in *Apprendi v. New Jersey*.[12]  Based on the Supreme Court's decision in *United States v. Cotton*,[13] we hold that Cardoza's and Herrera's claims lack merit.  Conversely, as the government does not dispute that Mona's sentence contravenes *Apprendi*, we vacate Mona's sentence and remand Mona's case for re-sentencing.

When, as here, the appellant failed to raise an objection to his sentence at the district court level, we apply a plain error standard of review, "which requires considerable deference to the district court."  *United States v. Peltier*, 505 F.3d 389, 391 (5th Cir. 2007).  Under the plain error standard, the appellant must demonstrate: "(1) there was error, (2) that was plain, (3) the error affects substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Blocker*, 612 F.3d 413, 415–16 (5th Cir. 2010) (per curiam).

---

[12] 530 U.S. 466 (2000).

[13] 535 U.S. 625 (2002).

No. 09-50323

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. This paradigm shifts, however, when a sentence is reviewed on appeal for plain error. *Cotton*, 535 U.S. at 627–33. In such instances, even if the court failed to instruct the jury to make specific findings justifying an increase in the maximum sentence imposed upon a defendant, the sentence will nevertheless be upheld where the evidence justifying the increased sentence was "overwhelming" and "essentially uncontroverted." *Id.* at 633.

The *Cotton* decision is dispositive of Cardoza's and Herrera's claims in this case. In *Cotton*, the operative indictment charged the defendants with conspiring to distribute and to possess with intent to distribute a "detectable amount" of cocaine; however, the indictment did not allege any threshold quantities of drugs to enable enhanced penalties under 21 U.S.C. § 841(b).[14] *Id.* at 628. The jury found the defendants guilty of the alleged conspiracy but did not make any findings regarding the specific amounts of cocaine that the defendants conspired to possess and distribute. *Id.* Nevertheless, at sentencing, the district court increased the statutory maximums of the defendants' sentences by finding that their respective offenses involved specific quantities of cocaine, ranging from 500 grams to 1.5 kilograms of cocaine base. *Id.*

Relying on *Apprendi*, the defendants appealed the district court's decision because "the issue of drug quantity was neither alleged in the indictment nor submitted to the petit jury." *Id.* at 628–29. The Fourth Circuit vacated the

---

[14] The initial indictment charged the defendants with conspiring to distribute and to possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846. *Cotton*, 535 U.S. at 627. A superseding indictment then charged the defendants with only conspiring to distribute and to possess with intent to distribute a "detectable amount" of cocaine. *Id.* at 627–28.

17

defendants' convictions and the government appealed to the Supreme Court. *Id.* at 629.

Reviewing the district court's sentence for plain error, the Supreme Court essentially held that, despite the district court's *Apprendi* violation, the defendants' convictions should not have been vacated by the Fourth Circuit. *Id.* at 632–34. The Court explained that the sentence enhancements survived plain error review because they were based on "overwhelming" and "essentially uncontroverted" evidence adduced at trial regarding the amount of cocaine involved in the conspiracy. *Id.* at 633.

In this case, the jury found Cardoza and Herrera guilty of violating 18 U.S.C. § 1962(d), which carries a maximum prison sentence of "not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment) . . . ." 18 U.S.C. § 1963(a). Without obtaining specific sentence enhancement findings from the jury, the district court increased Cardoza's and Herrera's sentences for violating § 1962(d) from 20 years to life. Such an enhancement would have been permissible if it had been based on Cardoza's and Herrera's predicate RICO offenses of conspiring to traffic in narcotics in violation 21 U.S.C. §§ 841(a)(1) and 846, which carries a life sentence when sufficient amounts are involved. However, Cardoza correctly notes that such an enhancement would not have been permissible if the jury had based his § 1962(d) conviction entirely on his predicate RICO offense of conspiracy to commit money laundering under 18 U.S.C. § 1956(h). Cardoza and Herrera contend that the district court plainly erred when it imposed life sentences without receiving specific findings from the jury regarding the underlying basis for their increased sentences.

We conclude that the appellants' theories are without merit because the jury did return the requisite special findings on Cardoza's and Herrera's § 1962(c) RICO convictions. The jury specifically found beyond a reasonable

18

doubt that Cardoza and Herrera both conspired to possess with intent to distribute either one kilogram or more of heroin or five kilograms or more of cocaine. This finding, which established one of the predicate acts for their § 1962(c) convictions, also provides "overwhelming" and "essentially uncontroverted" support for the district court's life sentence under § 1962(d). *See* 21 U.S.C. § 841(b) (providing a maximum sentence of life for trafficking in one kilogram or more of heroin or five kilograms or more of cocaine); *see also United States v. Warneke*, 310 F.3d 542, 549 (7th Cir. 2002) ("The maximum penalty following a RICO conviction depends on the maximum penalty for the most serious predicate offense."). The district court simply used the jury's specific findings on the § 1962(c) count as the basis for enhancing the convictions for violating § 1962(d). Thus, we hold that, in light of *Cotton*, the district court did not plainly error when sentencing Cardoza and Herrera to life imprisonment for violating § 1962(d).

On the other hand, the foregoing discussion does not support affirmance of Mona's sentence, as Mona was only convicted for his role in the RICO conspiracy and not for any predicate RICO offenses. The government also does not dispute that remand for re-sentencing is appropriate in Mona's case. Accordingly, we vacate Mona's sentence and remand Mona's case for re-sentencing.

## C.

Cardoza and Alvarez claim that the district court erred procedurally when it allegedly sentenced them without considering the factors set forth in 18 U.S.C. § 3553, thus contravening the Supreme Court's decision in *United States v. Booker*.[15] Where, as here, the appellant did not object to the district court's alleged failure to consider the § 3553 factors, we review the district court's

---

[15] 543 U.S. 220 (2005).

decision for plain error. *United States v. Mondragon-Santiago*, 564 F.3d 357, 364 (5th Cir. 2009).

Although the district court stated that the appellants were sentenced for their roles in the BA criminal enterprise, the district court did not explicitly address the § 3553 factors when sentencing the appellants.[16]  On two occasions, the court stated that "if I didn't have the guidelines, as really they're advisory only, the sentence would still be life on the proper counts."  The district court also stated that it was imposing the sentences based on its acceptance of the information in the pre-sentence report.  The district court then sentenced Cardoza and Alvarez to life imprisonment, which fell within the appropriate Guidelines range.

Assuming *arguendo*, that the district court erred in failing to explicitly address the § 3553 factors, we conclude that there was no plain error.  In order to prove plain error, the appellants must show that the error "affected the outcome in the district court: To meet this standard the proponent of the error must demonstrate a probability sufficient to undermine confidence in the outcome."  *Id.* (citations and internal quotation marks omitted).  Here, the appellants merely highlight the court's failure to explicitly address the § 3553 factors and they offer nothing to indicate that a discussion of the factors would have affected their within-Guidelines sentences.  *See also id.* at 365 ("Mondragon-Santiago's sentence is within the Guidelines, and he fails to show that an explanation would have changed his sentence.").  Accordingly, we

---

[16] With regard to Perea, for instance, the district court stated that "if you're the head or participate in an organization that regularly threatens violence, regularly deals in drugs, regularly launders money, regularly commits murder, then it's foreseeable that any one of these acts that takes place with that organization is accountable to them."  The court implied that this conclusion supported Cardoza's and Alvarez's sentences, as, like Perea, both Cardoza and Alvarez held leadership positions in the BA.

No. 09-50323

conclude that the district court did not plainly err when sentencing Cardoza and Alvarez.

## D.

Cardoza, Alvarez, and Perea contend that the district court erroneously denied their motions for a new trial because the court's juror anonymity and other security measures created an atmosphere of guilt that prevented them from receiving a fair trial. This contention is meritless as the district court did not abuse its discretion in implementing the security measures.

We review a district court's decision to empanel an anonymous jury and implementation of security measures for abuse of discretion. *United States v. Edwards*, 303 F.3d 606, 615 (5th Cir. 2002); *United States v. Nicholson*, 846 F.2d 277, 279 (5th Cir. 1988). "[A] district court does not abuse its discretion to empanel an anonymous jury if the 'evidence at trial supports the conclusion that anonymity was warranted.'" *United States v. Sanchez*, 74 F.3d 562, 564 (5th Cir. 1996) (quoting *United States v. Krout*, 66 F.2d 1420, 1427 (5th Cir. 1995)).

We condone the use of anonymous juries only "when needed to ensure against a serious threat to juror safety, if the courts also protect the defendants' interest in conducting effective voir dire and maintaining the presumption of innocence." *Sanchez*, 74 F.3d at 564 (internal quotation marks omitted). The following factors may justify a district court's decision to empanel an anonymous jury: (1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment. *Krout*, 66 F.3d at 1427.

No. 09-50323

On October 8, 2008, the district court issued a *sua sponte* order directing that the selected jury remain anonymous and that the U.S. Marshals Service provide secure off-site parking and transportation to-and-from the courthouse for the jury members. The court explained that it was implementing these measures "[b]ecause of the nature of the case, as well as the probability of greater than usual media attention, the Court [had] concern for the safety and privacy of the jurors before, during, and after the conduct of the trial, as well as for their continued objectivity."

There was significant evidence presented at trial that justified the court's decision to implement the anonymity and security measures. In fact, all of the above factors, save factor 3, clearly support the court's action. *See also United States v. Perea*, 625 F. Supp. 2d 327, 337–38 (W.D. Tex. 2009) (district court's post-trial memorandum opinion further explaining its reasoning for implementing the safety precautions, including its concern for media attention). Furthermore, although the appellants' attorneys did not know the names and addresses of the jurors, the attorneys were nevertheless able to conduct effective voir dire as they had access to a sufficient amount of information concerning each of the prospective jurors and were also given the opportunity to question the venire.[17] Likewise, during its voir dire, the district court carefully queried the venire to ensure that no prospective jurors would be influenced by the anonymity and security measures.

We hold that the district court did not abuse its discretion in implementing the juror anonymity and safety measures.

---

[17] The venire questionnaire contained general biographical information, including age, ethnic background, marital status, city of residence, length of residence, home ownership, English proficiency, family make-up, criminal history, occupation, and other useful information.

No. 09-50323

E.

Cardoza and Perea challenge the district court's denial of their motions for a new trial based upon the government's alleged suppression of evidence in violation of the Supreme Court's decision in *Brady v. Maryland*.[18]  Specifically, Cardoza and Perea argue that certain pieces of information contained in the pre-sentence report were withheld during discovery.  We disagree with the appellants because there is nothing in the record indicating that the government suppressed any evidence.[19]

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady*, 373 U.S. at 87.  A defendant seeking a new trial based on a *Brady* violation must prove that: "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material to either guilt or punishment." *United States v. Runyan*, 290 F.3d 223, 245 (5th Cir. 2002).

The district court determined that Cardoza and Perea failed to provide any evidence indicating that the government suppressed evidence.  *See Perea*, 625 F. Supp. 2d at 330–31 ("Undoubtedly, the Government at no time suppressed the evidence—the 302 reports—that formed the basis of the [pre-sentence report]."). Upon our review of the record and the district court's detailed opinion, we agree with the district court that the information contained in the pre-sentence report

---

[18] 373 U.S. 83 (1963).

[19] "While the standard of review for a motion for a new trial is typically abuse of discretion, if the reason for the motion is an alleged *Brady* violation then we review the district court's determination *de novo*." *United States v. Martin*, 431 F.3d 846, 850 (5th Cir. 2005). However, "[w]e have cautioned that, as we review *Brady* claims 'at an inherent disadvantage' because of the cold record, we must accord due deference to the trial court's ruling on the alleged *Brady* error." *United States v. Miller*, 520 F.3d 504, 514 (5th Cir. 2008) (citing *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004)).

No. 09-50323

was previously disclosed to the appellants. Accordingly, we hold that Cardoza's and Perea's contentions under *Brady* are without merit.

## F.

Alvarez appeals the district court's admission of his prison bank records (Exhibit 353) and a summary of those records (Exhibit 354) on the theory that the admission of those documents violated his right to confront witnesses under the Sixth Amendment's Confrontation Clause.[20] Specifically, Alvarez objects to the court's admission of Exhibit 353 without first allowing him the opportunity to cross-examine the custodian of Alvarez's prison records. Alvarez objects to Exhibit 354 because it summarized the allegedly inadmissible information found in Exhibit 353. We hold that Alvarez's claim under the Confrontation Clause is without merit.[21]

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford*, the Supreme Court held that the Confrontation Clause is violated when the prosecution introduces "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2007). However, the Court also stated that some statements are non-testimonial and, therefore, fall outside of the Confrontation Clause's protection. *Id.* at 56. These statements include "business records or statements in furtherance of a conspiracy." *Id.* After *Crawford*, we held that records kept in the ordinary course of business are non-testimonial; whereas "those that are specifically produced for use at trial . . . are 'testimonial' and are at the heart of

---

[20] Alvarez does not otherwise challenge the admissibility of Exhibits 353 and 354.

[21] We review an alleged violation of a defendant's rights under the Confrontation Clause *de novo*, subject to harmless error analysis. *United States v. Morgan*, 505 F.3d 332, 338 (5th Cir. 2007).

24

No. 09-50323

statements triggering the Confrontation Clause." *United States v. Martinez-Rios*, 595 F.3d 581, 586 (5th Cir. 2010) (per curiam).

Alvarez's bank records were kept in the ordinary course of business; they were not specifically prepared for use at trial. Thus, under *Crawford* and *Martinez-Rios*, the bank records were non-testimonial business records that fell outside of the purview of the Confrontation Clause.

Exhibit 354, on the other hand, was prepared specifically for trial by Special Agent Mikeska for the purpose of simplifying the information found in Exhibit 353. There is no Confrontation Clause issue regarding Exhibit 354, however, because: (1) it contained only a summary of admissible information found in Exhibit 353; and (2) Special Agent Mikeska testified extensively at trial and Alvarez had ample opportunity to address the exhibit on cross-examination.

Accordingly, we hold that the district court did not err in admitting Exhibits 353 and 354.

## G.

Perea argues that the district court abused its discretion in denying his motion for an evidentiary hearing during the trial's sentencing phase. Perea argues that the 97-page pre-sentence report "attempted to hold Perea accountable for the collection of $960,000.00 in *cuota* (taxes), a large volume of illicit drugs, and the murders of eight individuals." According to Perea, a hearing was necessary "so that the government could establish a nexus between the alleged crimes and Perea before he could be held accountable for such."

We review the denial of an evidentiary hearing for abuse of discretion. *United States v. Henderson*, 19 F.3d 917, 927 (5th Cir. 1994). We have held that a defendant is not automatically entitled to a sentencing hearing that amounts to a "mini-trial, complete with exhibits, expert witnesses, character witnesses, and an opportunity to cross examine the government's witnesses." *Id.*; *see also United States v. Maurer*, 226 F.3d 150, 151 (2d Cir. 2000) (per curiam) ("The

25

No. 09-50323

district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes . . . ."). A "sentencing court must be given deference to determine whether a hearing is needed on particular sentencing issues." *Henderson*, 19 F.3d at 927. However, "[w]hen a hearing is necessary to protect a convicted defendant's due process rights, then the failure to hold a hearing" constitutes an abuse of discretion. *Id.*

We conclude that the district court did not abuse its discretion in declining to hold an evidentiary hearing because Perea has failed to show the utility of conducting such a hearing. Perea did not present any evidence to the district court to rebut the information contained in the pre-sentence report,[22] and he concedes before us that "the trial court had more than sufficient evidence, based upon the 4000 pages of testimony," to adequately rule without any additional evidence from Perea. This concession undermines Perea's claim as it demonstrates that a full blown evidentiary hearing would have been a pointless exercise in this case.

Accordingly, the district court did not abuse its discretion in denying Perea's motion for an evidentiary sentencing hearing.

H.

Herrera and Enriquez argue that the district court sentenced them while relying on improper information contained in the pre-sentence report. We disagree.

---

[22] During the joint sentencing hearing for the six appellants, the court indicated its awareness of the contents of the pre-sentence report and its familiarity with the defendants' objections to that report. It also entertained, but overruled, most of Perea's objections to the report, finding that Perea, as a proven *capo*, should be held accountable for all the foreseeable acts that occurred while he was leading the BA's criminal conspiracy. However, the district court did sustain Perea's objection to the pre-sentence report's statement that Perea was "the most feared member of the BA" and had the statement removed from the report.

26

No. 09-50323

In making factual findings for sentencing purposes, the district court may consider any evidence "which bears sufficient indicia of reliability to support its probable accuracy, including hearsay evidence." *United States v. Solis*, 299 F.3d 420, 455 (5th Cir. 2002) (citation and internal quotation marks omitted). We consider whether the district court's findings were clearly erroneous, remaining mindful that such findings "are not clearly erroneous if they are plausible in light of the record reviewed in its entirety." *Id.* Furthermore, a district court may adopt the facts in a pre-sentence report "without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information" contained in the report is unreliable. *Valdez*, 453 F.3d at 262 (quoting *United States v. Cabrera*, 288 F.3d 163, 173–74 (5th Cir. 2002)).

In this case, there is no indication that the information contained in the pre-sentence report was implausible in light of the record reviewed in its entirety. The appellants simply posit that the report's findings are incorrect but fail to point to the existence of any evidence in rebuttal to cast doubt upon the reliability of the pre-sentence report. Accordingly, we conclude that this issue is without merit.

I.

Enriquez contends that the district court erred in denying his motion to suppress statements made to the El Paso Police Department when he was brought to the department for questioning in the year preceding his indictment. Enriquez argues that his statements to police were non-consensual and involuntarily obtained.

When reviewing the denial of a motion to suppress, the district court's findings of fact are reviewed for clear error, viewing the evidence in the light most favorable to the government, and its conclusions of law are reviewed *de novo*. *United States v. Charles*, 469 F.3d 402, 405 (5th Cir. 2006). A finding of

No. 09-50323

fact "is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 296 (5th Cir. 2008) (citation and internal quotation marks omitted).

On September 30, 2008, the district court issued a detailed opinion regarding Enriquez's motion to suppress. *See United States v. Enriquez*, 2008 WL 4600557 (W.D. Tex. Sept. 30, 2008). Upon thorough review of the district court's underlying factual and legal analysis, we conclude that the court's findings of fact are not clearly erroneous and that the court applied the correct legal standards. Accordingly, for the reasons articulated by the district court, we affirm the denial of Enriquez's motion to suppress. *See id.* at *3–4.

## J.

Enriquez argues that the district court abused its discretion in denying his Rule 14 motion for severance.[23] We disagree.[24]

"As a general rule, persons indicted together should be tried together, particularly when the offense is conspiracy." *United States v. Simmons*, 374 F.3d 313, 317 (5th Cir. 2004) (per curiam) (citing *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993)). "In ruling on a motion to sever, a trial court must balance potential prejudice to the defendant against the 'public interest in joint trials where the case against each defendant arises from the same general transaction.'" *Id.* (quoting *Kane*, 887 F.2d at 571). "To demonstrate reversible

---

[23] Rule 14 provides: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

[24] "A district court's ruling on a motion to sever will not be disturbed absent a showing that the district court abused its discretion." *United States v. Kane*, 887 F.2d 568, 571 (5th Cir. 1989).

28

No. 09-50323

error, even where initial joinder was improper, a defendant must show 'clear, specific and compelling prejudice that resulted in an unfair trial.'" *Id.* (quoting *United States v. Posada Rios*, 158 F.3d 832, 863 (5th Cir. 1998)). "This prejudice must be of a type 'against which the trial court was unable to afford protection.'" *Id.* (quoting *United States v. Mann*, 161 F.3d 840, 863 (5th Cir. 1998)).

We conclude that Enriquez has not demonstrated that clear, specific, and compelling prejudice resulted at trial from the district court's denial of his severance motion. Nor could he do so as the outcome of the trial indicates that he was not unfairly prejudiced by the crimes of the other BA members. The district court, for example, granted Enriquez's motion for judgment of acquittal on the charge of narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) and 846. Likewise, the jury acquitted Enriquez on the charge of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). Enriquez was only convicted of the crime that he actually confessed to participating in: conspiring to extort *cuota* payments. There is no indication that granting the motion for severance would have improved Enriquez's chances of obtaining a judgment of acquittal on that count. Accordingly, we hold that the district court did not abuse its discretion in denying Enriquez's motion for severance. *See Kane*, 887 F.3d at 571 ("In order to prevail on appeal, the appellant must show *more than* that a separate trial offered a better chance of acquittal.") (emphasis added).

## K.

Herrera contends that the district court erred in admitting unauthenticated handwritten BA letters and transcripts of recorded BA conversations. Herrera provides virtually no support for his argument. He instead relies on broad, generalized statements to make his point. For instance, Herrera alleges that "the numerous and voluminous evidence introduced by the Government in this case was improperly admitted based on improper foundation and over objection." We conclude that Herrera has failed to adequately brief this

29

No. 09-50323

issue and it is, therefore, waived.  *See* Fed. R. App. P. 28(a)(9)(A); *Martinez*, 263 F.3d at 438.

## III.

For the foregoing reasons, save for Mona's sentence, which we VACATE and REMAND for re-sentencing, the judgment of the district court is AFFIRMED.